IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Wiley Y. Daniel

Civil Action No. 07-cv-02363-WYD

PETER COMPTON,

      Applicant,

v.

STEVE HARTLEY, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

## ORDER OF DISMISSAL

---

I.  FACTUAL AND PROCEDURAL BACKGROUND

      Applicant Peter Compton is a prisoner in the custody of the Colorado Department

of Corrections (DOC) at the Limon, Colorado, Correctional Facility.  Mr. Compton has

filed a *pro se* Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254

challenging his Colorado state conviction and sentence in Adams County District Court

in Case No. 97CR1240.  On February 11, 2008, I ordered Respondents to file an

Answer to the Application, which they did on February 26, 2008.  Mr. Compton filed a

Traverse on March 11, 2008.

      I must construe liberally the Application and the Traverse because Applicant is a

*pro se* litigant.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*,

935 F.2d 1106, 1110 (10th Cir. 1991).  However, I should not act as a *pro se* litigant's

advocate.  *See Hall*, 935 F.2d at 1110.  After reviewing the entire file, I find that an

evidentiary hearing is not necessary.  For the reasons stated below, the Application will be denied, and the action will be dismissed.

In the Application, Mr. Compton asserts he was convicted by a trial jury of one count of murder after deliberation and was sentenced to life without the possibility of parole.  (Application at 2.)[1]  Mr. Compton states that he filed a direct appeal, in which his conviction was affirmed, and his petition for writ of certiorari was denied on October 23, 2000.  (Application at 3.)  Mr. Compton further asserts he filed a Colo. R. Crim. P. 35(c) postconviction motion on December 22, 2000, that was denied by the state's highest court on August 27, 2007.  (Application at 5.)  I find, and Respondents concede, that the instant action is timely under 28 U.S.C. § 2244(d).

Mr. Compton raises five claims, including that: (1) his Sixth and Fourteenth Amendment rights were violated because the first degree murder charge was based on an erroneous definition of "after deliberation;" (2) his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court refused to replace a juror who was observed sleeping during the presentation of defense's case; (3) his due process rights were violated when expert DNA (deoxyribonucleic acid) testimony was subject to errors and prosecutorial misconduct; (4) his trial counsel was ineffective in not challenging the DNA evidence; and (5) the trial court erred in deeming his non-DNA issues abandoned. (Application at 7-19.)

---

[1]  Page numbers referred to in citations to documents filed in this case are the page numbers identified by the Court's Electronic Court Filing system.

## II.  STANDARD OF REVIEW

### A. Exhaustion of State Remedies

Pursuant to 28 U.S.C. § 2254(b)(1), an application for a writ of habeas corpus may not be granted unless it appears that the applicant has exhausted state remedies or that no adequate state remedies are available or effective to protect the applicant's rights.  *See O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994).  The exhaustion requirement is satisfied once the federal claim has been presented fairly to the state courts.  *See Castille v. Peoples*, 489 U.S. 346, 351 (1989).  Fair presentation requires that the federal issue be presented properly "to the highest state court, either by direct review of the conviction or in a postconviction attack."  *Dever*, 36 F.3d at 1534.  "The exhaustion requirement is not one to be overlooked lightly."  *Hernandez v. Starbuck*, 69 F.3d 1089, 1092 (10th Cir. 1995).  "[A] state prisoner bringing a federal habeas corpus action bears the burden of showing that he has exhausted all available state remedies."  *See Miranda v. Cooper*, 967 F.2d 392, 398 (10th Cir. 1992) (citing *Clonce v. Presley*, 640 F.2d 271, 273 (10th Cir. 1981)).

Respondents concede that Mr. Compton has exhausted Claims One through Four.  With respect to Claim Five, Respondents argue that, although Mr. Compton was represented by counsel during his postconviction proceedings, and the state court conducted a postconviction hearing, he did not present any evidence in support of his non-DNA claims.  (Answer at 10.)  Respondents conclude that as a result the trial court and the court of appeals ruled the claims abandoned, and the ruling constitutes a state

procedural default that forecloses federal habeas review.  (Answer at 10.)

<u>Claim Five/Abandoned Claims</u>

Mr. Compton asserts that the trial court incorrectly deemed as abandoned the claims he raised in his postconviction motion but did not address in the postconviction hearing.  (Application at 18.)  Respondents argue that under Colorado law the burden is upon the defendant, as the moving party, to establish his claim by a preponderance of the evidence in a postconviction proceeding.  (Answer at 30.)  Respondents further contend that seven of Mr. Compton's postconviction non-DNA-related claims were predicated on allegations of ineffective assistance of counsel, but, since he did not present any evidence to support these claims at the postconviction hearing, he failed to establish them by a preponderance of the evidence.  (Answer at 30.)  Respondents also contend that three of Mr. Compton's claims were litigated in a pretrial hearing on September 26, 1997, were decided adversely on the merits, and were not pursued at the postconviction hearing or on direct appeal.  (Answer at 30.)  Respondents conclude that the trial court was correct to consider these claims abandoned.  (Answer at 30.)

Relying on *People v. Rodriguez*, 914 P.2d 230, 251 (Colo. 1996), the Colorado Court of Appeals found that Mr. Compton had abandoned his claims because issues inadequately raised in the trial court will not be addressed for the first time on appeal. *State of Colo. v. Compton*, No. 05CA1442 at 12 (Colo. App. Apr. 19, 2007).  The court of appeals also found that Mr. Compton did not argue that any of the abandoned claims were determinable as a matter of law.  *Id.*

With respect to the abandonment of Mr. Compton's non-DNA claims, I find the

4

following.  The claims presented in the postconviction brief but not raised in the postconviction hearing are subject to dismissal by the trial court if they are inadequately raised or supported by the postconviction motion.  *Rodriguez*, 914 P.2d at 251.  Mr. Compton's postconviction attorney, on at least two occasions, stated that Mr. Compton desired for the trial court to consider all claims in the Rule 35(c) motion, even though not all of the claims were raised in the postconviction hearing.  *State of Colorado v. Compton*, No. 97CR1240 Vol. # 14 at 7 and Vol. # 16 at 62-63 (Adams Cnty. Dist. Ct. Mar. 2, 1998).  The prosecution, in response to the postconviction attorney's second request, asserted that it is Mr. Compton's burden to submit evidence in support of his claims.  Vol. # 16 at 63.  The prosecution also stated that any claims not presented at the postconviction hearing were simply statements in Mr. Compton's *pro se* motion and, therefore, were abandoned.  Vol. # 16 at 63.  Mr. Compton's attorney did not respond to the prosecution's argument and state how the claims were adequately raised or supported by the postconviction motion.

Furthermore, although in Claim Five Mr. Compton challenges the trial court's decision to find the claims he did not present at the postconviction hearing as abandoned, he has not presented the claims to this Court and explained how he adequately presented each claim in his postconviction proceeding, in keeping with Colorado law in *Rodriguez*.  Therefore, any of the claims not raised in the postconviction hearing and found abandoned by the trial court are not properly before me.

Claims are precluded from federal habeas review when the claims have been defaulted in state court on an independent and adequate state procedural ground.

5

*Steele v. Young*, 11 F.3d 1518, 1521 (10th Cir. 1993) (citations omitted). "A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for the decision . . . . For the state ground to be adequate, it must be strictly or regularly followed and applied evenhandedly to all similar claims." *See Hickman v. Spears*, 160 F.3d 1269, 1271 (10th Cir. 1998) (internal quotations and citations omitted). Also, if it is obvious that an unexhausted claim would be procedurally barred in state court the claim is held procedurally barred from federal habeas review. *Steele*, 11 F.3d at 1524 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Harris v. Reed*, 489 U.S. 255, 269-70 (1989)).

The time limitation established by Colo. Rev. Stat. § 16-5-402 is a firmly established and regularly followed procedural rule. *See Klein v. Neal*, 45 F.3d 1395, 1398 (10th Cir. 1995). Section 16-5-402 provides that a defendant who has been convicted of any felony, other than a class one felony, must commence a collateral attack of the conviction within three years of the date of the conviction. As for a successive postconviction motion, the Colorado Rules of Criminal Procedure prohibit successive postconviction Rule 35 motions with limited exceptions. *See* Colo. R. Crim. P. 35(c)(3)(VI) and (VII).

"Generally speaking, [the court] do[es] not address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Cummings v. Sirmons*, 506 F.3d 1211, 1224 (10th Cir. 2007) (Internal quotation and citation omitted). Mr. Compton's *pro se* status does not exempt

6

him from the requirement of demonstrating either cause and prejudice or a fundamental miscarriage of justice. *See Lepiscopo v. Tansy*, 38 F.3d 1128, 1130 (10th Cir. 1994).

Here, Mr. Compton, by not presenting evidence at the postconviction hearing in support of each of the claims, that were found abandoned, failed to adequately present his claims to the trial court as required. *Rodriguez*, 914 P.2d at 251 (citing *Hooker v. People*, 477 P.2d 376, 377 (Colo. 1970)). He now has defaulted the claims under Colo. R. Crim. P. 35(c)(3)(VI) and (VII) and § 16-5-402. Because Mr. Compton has failed to demonstrate either cause and prejudice or a fundamental miscarriage of justice for the basis of defaulting his claims, he is procedurally barred from raising Claim Five in this Court.

B.  Merits

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Claims of legal error and mixed questions of law and fact are reviewed pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question pursuant to § 2254(d)(1) is whether Mr. Compton seeks to apply

a rule of law that was clearly established by the Supreme Court at the time his

conviction became final.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Clearly

established federal law "refers to the holdings, as opposed to the dicta, of [the

Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id.* at

412.  Furthermore,

> clearly established law consists of Supreme Court holdings
> in cases where the facts are at least closely-related or
> similar to the case *sub judice*.  Although the legal rule at
> issue need not have had its genesis in the closely-related or
> similar factual context, the Supreme Court must have
> expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of my inquiry

pursuant to § 2254(d)(1).  *See id.* at 1018.  If a clearly established rule of federal law is

implicated, I must determine whether the state court's decision was contrary to or an

unreasonable application of that clearly established rule of federal law.  *See Williams*,

529 U.S. at 404-05.  Pursuant to *House,*

> A state-court decision is contrary to clearly established
> federal law if: (a) the state court applies a rule that
> contradicts the governing law set forth in Supreme Court
> cases; or (b) the state court confronts a set of facts that are
> materially indistinguishable from a decision of the Supreme
> Court and nevertheless arrives at a result different from [that]
> precedent.  *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th
> Cir. 2006).  The word contrary is commonly understood to
> mean diametrically different, opposite in character or nature,
> or mutually opposed.
>
> A state court decision involves an unreasonable
> application of clearly established federal law when it
> identifies the correct governing legal rule from Supreme

> Court cases, but unreasonably applies it to the facts.
> Additionally, we have recognized that an unreasonable
> application may occur if the state court either unreasonably
> extends, or unreasonably refuses to extend, a legal principle
> from Supreme Court precedent to a new context where it
> should apply.

*House*, 527 F.3d at 1018 (internal quotations and citations omitted).

My inquiry pursuant to the "unreasonable application" clause is an objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. "[O]nly the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.*

Claims of factual error are reviewed pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows me to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Pursuant to § 2254(e)(1), I must presume that the state court's factual determinations are correct, and Mr. Compton bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because]

'[d]eference does not by definition preclude relief.' "  *Miller-El v. Dretke*, 545 U.S. 231,

240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, I "owe deference to the state court's *result*, even if its reasoning is not

expressly stated."  *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).  Therefore, I

"must uphold the state court's summary decision unless [my] independent review of the

record and pertinent federal law persuades [me] that its result contravenes or

unreasonably applies clearly established federal law, or is based on an unreasonable

determination of the facts in light of the evidence presented."  *Id.* at 1178.  "This

'independent review' should be distinguished from a full de novo review of the

petitioner's claims."  *Id.* (citation omitted).

### 1. Claim One/Erroneous Definition of "After Deliberation"

Mr. Compton asserts that his Sixth and Fourteenth Amendment rights were

violated when the trial court gave the jury an erroneous definition of "after deliberation"

in response to the jury's requests that the court (1) please define deliberation with

regard to instruction # 8; (2) explain if deliberation can occur sometime during the

commission of the act, *i.e.* while switching weapons; and (3) explain if deliberation has

to occur before the commission of the act.  Mr. Compton also asserts that in response

to the jury's question the trial court directed the jury to follow instruction # 8 and stated:

> After deliberation requires that the intent to commit the
> homicidal act must precede the commission of the act itself.
> This is one of the elements which the prosecution must
> prove beyond a reasonable doubt either by direct or
> circumstantial evidence.  However, no specific time interval
> is required so long as there is sufficient time to permit one
> thought to follow another.

(Application at 8.) Mr. Compton further asserts that his counsel objected to the response and requested that the jury be referred to the statutory definition. Mr. Compton further contends that the instruction was particularly prejudicial because the forensic pathologist testified that the victim probably was dead after the first two of sixteen blows to the head if the first two blows to the head were the strongest, and definitely he was dead prior to the assailant changing weapons and stabbing the victim in the back. (Application at 8.)

Mr. Compton further contends that if the jury believed deliberation was formed while the assailant switched weapons he would be guilty only of second degree murder, but if the jury believed deliberation first arose at an earlier time during the attack they still would have to determine whether deliberation arose before the fatal blow. (Application at 8.) Mr. Compton concludes that the trial court's instruction did not clarify the matter to the jury and misled the jury that deliberation was an intent that could arise a split second before the act. (Application at 8.)

Respondents argue that the day after the trial court gave the instruction to the jury in response to their inquiries, as cited above, the district attorney requested that the trial court reconsider the instruction to the jury because part of the instruction was incorrect under *Key v. People*, 715 P.2d 319 (Colo. 1986). Respondents further argue that in response to the district attorney's request, the trial court stated the following:

> I have prepared a second answer to give to the jury, and I will state also that it's my understanding that the jury has indicated that they have a decision in this case. I'm sending them a second answer, an amendment, a correction, at this point in time, before accepting any verdict, I propose to give

11

this answer to them when they come back from lunch.  We ceased the deliberations, by the way, and sent them to lunch. That would read,

> I'm amending the answer to your question which I gave to you yesterday, specifically, the portion where I said that "no specific time interval is required, as long as there is sufficient time to permit one thought to follow another."  The correct statement of the law is that between the forming of the intent to do the act and the act itself an appreciable length of time must have elapsed to allow deliberation, reflection and judgment. The appreciable length of time need not be long.

> I apologize for my error.  If this amendment affects your verdict, please continue your deliberations.

(Answer at 14-15.)  Respondents also assert that the trial court judge labeled the correction as an instruction, brought the jury back into the courtroom, and reinstructed them verbally and in writing before receiving the verdict.  (Answer at 15.)  Respondents also state that the Colorado Court of Appeals declined to decide the specific issue of whether the trial court could correct an erroneous instruction because even if it was an error the error was harmless.  (Answer at 15.)  Respondents further state that the court of appeals found that the identical instruction was held harmless in *Key*, and that the deliberation element was immaterial to Mr. Compton's defense, because deliberation may be shown by the evidence presented at trial that he wore a leather glove over a rubber glove when he assaulted the victim.  (Answer at 15.)

Respondents contend that jury instructions are usually an issue of state law and not proper for habeas review.  (Answer at 16.)  They further contend that a state

conviction only may be set aside in a habeas proceeding based on erroneous jury instructions when the errors have the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial.  (Answer at 16.)  Respondents also assert that the degree of prejudice from the instruction error must be evaluated in the context of the trial events.  (Answer at 16.)  Respondents conclude that because the trial court corrected the jury instructions before the jury reported its verdict, the instruction cited by Mr. Compton could not have resulted in a decision that meets the standard for habeas relief, and Mr. Compton failed to demonstrate that the instruction rendered his trial fundamentally unfair.  (Answer at 17.)

In his Traverse, Mr. Compton asserts that the Colorado Court of Appeals misstated the facts.  (Traverse at 2.)  He contends that the day after the jury received the instruction from the trial court the jury told the court it had reached a verdict and gave the verdict form to the bailiff, and at the same time the state asked the court to amend the instruction regarding the jury's question from the previous day.  (Traverse at 22.)  Mr. Compton further contends that a motion for mistrial was denied, and the court gave the instruction as Respondents assert above.  (Traverse at 22.)  Mr. Compton concludes that (1) the trial court judge did not make clear to the jury that the corrected instruction necessarily would require further deliberation if the jury had found him guilty of first degree murder based on the original instruction; (2) the jury could not have deliberated the issue under the corrected instruction in the five minutes that they did; and (3) the jury erroneously believed that the corrected instruction did not affect the verdict, which caused a structural error in the trial.  (Traverse at 22.)

13

Mr. Compton further argues that the jury was too invested in the guilty verdict that they already had reached after full deliberations under the erroneous instruction. (Traverse at 23.)  Mr. Compton also asserts that the corrected instruction still was not a correct statement of law because the instruction did not tell the jury that he must have actually exercised reflection and judgment before acting.  (Traverse at 23.)  Mr. Compton concludes that the trial court erred in not granting a mistrial on the first degree murder charge, because it was not possible for the court to cure the structural error caused by the erroneous instruction.  (Traverse at 23.)

An applicant has a "great burden when he seeks to collaterally attack a state court judgment based on an erroneous jury instruction."  *Lujan v. Tansy,* 2 F.3d 1031, 1035 (10th Cir. 1993) (internal quotation marks and citation omitted).  A state conviction may not be set aside on the "basis of erroneous jury instructions unless the errors had the effect of rendering the trial so fundamentally unfair" that a fair trial was denied, *Shafer v. Stratton,* 906 F.2d 506, 508 (10th Cir. 1990), or "so infected the entire trial that the resulting conviction violates due process," *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

An error in describing an element of the crime is a "trial error," not a "structural error."  *California v. Roy*, 519 U.S. 2, 5 (1996).  A jury instruction that misdescribes an element of an offense is subject to harmless error review.  *Neder v. United States*, 527 U.S. 1 (1999).  The harmless error inquiry is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' "  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

14

(1946).  Where the federal reviewing judge "is in grave doubt about whether a trial error

of federal law had substantial and injurious effect or influence in determining the jury's

verdict that error is not harmless."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)

(internal quotations omitted).  I find as follows.

<u>a.  Incorrect Amended Answer/Incorrect Law</u>

As stated above, Mr. Compton contends, in the Traverse, that the amended

answer to the jury was incorrect because it did not tell the jury that he actually must

have exercised reflection and judgment before acting, in accordance with the statute,

and not just that an appreciable length of time must have elapsed to allow deliberation,

reflection, and judgment.  (Traverse at 23.)  Although I do not have before me a copy of

Mr. Compton's opening brief in his direct appeal, and Mr. Compton did not raise the

issue in his Application for Respondents to address, the Colorado Court of Appeals

addressed Mr. Compton's incorrect amended answer claim and stated the following:

> Defendant also argues that the amended instruction did
> not cure the errors in the initial response.  Again, we
> disagree.
>
> Although defense counsel objected to the timing of the
> amended instruction, he did not object to its wording.  Thus,
> we review this contention only for plain error.  *See Bogdanov
> v. People, supra.*
>
> Defendant argues that the instruction was misleading
> because it included the phrase "time . . . to <u>allow</u>
> deliberation, reflection, and judgment," rather than telling the
> jury that he must have actually exercised reflection and
> judgment.  However, that phrase was based on *People v.
> Snead*, 183 Colo. 96, 514 P.2d 776 (1973), and was
> approved in *Key v. People*, *supra*.

*State of Colo. v. Compton*, No. 98CA0704 at 17 (Colo. App. 2000) (not selected for publication).

Upon review of the amended answer, entered in the state court record as instruction # 16, *State of Colo. v. Compton,* Case No. 97CR1240, State Court Record, Vol. # 1 at 100, I find that the amended answer did not address, as Mr. Compton suggests, the portion of the original instruction that stated, "the decision to commit the act has been made after the exercise of reflection and judgment concerning the act," State Court Record, Vol. # 1 at 86. In instruction # 16, the trial court judge stated that he was amending his answer, specifically the portion where the trial court judge stated that "no specific time interval is required so long as there is sufficient time to permit one thought to follow another." Vol. # 1 at 100. The judge stated that the correct statement of law is that "between the forming of the intent to do the act and the act itself an appreciable length of time must have elapsed to allow deliberation, reflection and judgment." *Id.* The judge did not indicate in instruction # 16 that there did not have to be an actual exercise of reflection and judgment concerning the act. He only was providing the proper statement of the law, under *Key*, for the specific time interval that is required between the forming of the intent and the act itself to allow for deliberation.

The original instruction was correct. The definition of "after deliberation" provided by the trial court judge is the definition set forth under Colo. Rev. Stat. § 18-3-101(3). Accordingly, I find that the state court's decision regarding instruction # 16 was not contrary to or an unreasonable application of any clearly established rule of federal law. Mr. Compton, therefore, fails to assert a meritful claim with respect to

instruction # 16.

### b. Jury Investment/Structural Error

As stated above, Applicant contends that the trial court judge did not make clear to the jury that the corrected instruction necessarily would require further deliberation if the verdict was guilty of first degree murder, and that the jury could not have deliberated the issue under the corrected instruction in the short time that they did. Applicant concludes that the error is structural and that the jury was too invested in their deliberations to further consider the corrected instruction.

As the Supreme Court explained in *Arizona v. Fulminante,* 499 U.S. 279 (1991), a structural error is an error that affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310. The Supreme Court has found the complete denial of counsel during a criminal trial, *see Gideon v. Wainwright,* 372 U.S. 335 (1963), and the presiding of an impartial judge, *see Turney v, Ohio*, 273 U.S. 510 (1927), to be structural errors that affect "[t]he entire conduct of the trial from beginning to end." *Fulminante*, 499 U.S. at 309. "These are structural defects in the constitution of the trial mechanism, which defy analysis by harmless error standards." *Id.* at 309 (internal quotations omitted). Mr. Compton's erroneous jury instruction is not a structural error.

Furthermore, upon review of the state court record, including the trial transcript, I find that a leather glove known to be Mr. Compton's was found in a dumpster near Mr. Compton's apartment, that the leather glove contained (1) DNA matching both the victim's DNA and Mr. Compton's DNA; (2) a mixture of blood, DNA matching Mr.

17

Compton's DNA, and DNA consistent with the victim; and (3) a cut between the index finger and the thumb that was produced by a sharp-edged blade.  Vol. # 8 at 131, 193, and 220, Vol. # 9 at 167.  The prosecution also presented as an exhibit a rubber glove that was found in the same dumpster near Mr. Compton's apartment where the leather glove was found, and the rubber glove had Mr. Compton's blood on it.  Vol. # 8 at 131-2 and 220.  Based on this evidence, and as determined by the Colorado Court of Appeals, once the jury rejected Mr. Compton's theory of the case, that someone other than Mr. Compton committed the crime, the jury reasonably could have found that he had sufficient time for deliberation, reflection, and judgment to form the requisite premeditated intent for first-degree murder.

As for any investment the jury may have had in the verdict they reached prior to receiving a corrected instruction and having to continue deliberation in light of the corrected instruction, generally it is presumed that juries follow a court's instruction. See Darks v. Mullin, 327 F.3d 1001, 1015 (10th Cir. 2003).  Simply because the jury took only five minutes to return a verdict after receiving a corrected instruction does not support a finding that the jury failed to follow the trial court judge's direction.  I, therefore, conclude that the erroneous jury instruction on the element of deliberation did not have a substantial and injurious effect or influence in determining the jury's verdict. I have no grave doubt that the error is harmless.  Accordingly, I find that the state court's decision regarding the structural error claim was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court.  The structural error claim, therefore, lacks merit.

18

2.  Claim Two/Sleeping Juror

In support of the sleeping juror claim, Mr. Compton asserts that a juror was asleep during testimony given by at least half of the defense's fourteen witnesses. (Application at 10.)  Mr. Compton further asserts that the trial court judge refused to allow trial counsel to present evidence regarding the sleeping juror and stated that he did not notice any of the jurors not paying attention.  (Application at 10.)  Mr. Compton concludes that the trial court judge's failure to replace the sleeping juror with an alternate juror violated his due process rights.  (Application at 10.)

Respondents argue that there is no clear and convincing reason to reject the state trial court's disposition of the facts surrounding the allegation that a juror had been sleeping.  (Answer at 18.)  Respondents contend that the trial court did not reach a conclusion opposite to a conclusion reached by the U.S. Supreme Court, nor did the court decide a case differently that the Supreme Court on a materially indistinguishable set of facts or unreasonably apply correct governing legal principles to the facts of Mr. Compton's case.  (Answer at 18.)

In addressing trial counsel's request for an evidentiary hearing regarding the sleeping juror, the trial court judge stated:

> THE COURT:  Well, I have been studying the jury quite closely, particularly during this trial, um, and I have not once noticed any juror not paying attention or sleeping, not once.

> THE COURT:  Because I have had the opportunity to review this–this jury, and I'm basing it based on my observations, I think she's paid attention, just as much as any of the other jurors, and I disagree with what other observations you or any of your family may have made.

19

I paid very close attention to these people, and simply don't feel that, based on my observations, that that's warranted.

Vol. # 10 at 5-6.

In finding Mr. Compton was not entitled to a new trial because of juror misconduct, the Colorado Court of Appeals stated as follows:

Finally, defendant asserts that the trial court committed reversible error by failing to replace, or at least question, a juror who was allegedly sleeping during the trial. We are not persuaded.

Jury misconduct that materially affects the substantial rights of a party, preventing a fair and impartial trial, may serve as grounds for a new trial. However, to be entitled to a new trial, a defendant must establish that he was prejudiced by the misconduct. The prejudicial effect of the misconduct is a determination of fact within the sound discretion of the trial court. *People v. Evans*, 710 P.2d 1167 (Colo. App. 1985). The mere possibility of prejudice is not sufficient to warrant reversal. *People v. Gladney*, 194 Colo. 68, 570 P.2d 231 (1977).

Defense counsel advised the court shortly before the conclusion of the trial that he and his family had noticed one of the jurors "nodding off" and that she had her eyes closed from time to time. He asked that she be replaced with an alternate. The trial court declined to do so, stating that it had been watching the jury closely and that, based on its own observations, the juror in question had been paying attention.

Where evidence relating to alleged juror misconduct is conflicting, we defer to a trial court's findings that are based on its own observations. *See People v. Gladney*, *supra*. (appellate courts must give deference to findings of trial court that are based on its observation of courtroom occurrences). Thus, defendant is not entitled to a new trial because of juror misconduct.

*State of Colo. v. Compton*, No. 98CA0704 at 18-19 (Colo. App. May 11, 2000).

A state trial judge has the benefit of observing the general demeanor of the jurors as the basis for his general finding. *Brecheen v. Reynolds,* 41 F.3d 1343, 1350 (10th Cir. 1994) (quoting *Church v. Sullivan*, 942 F.2d 1501, 1518 (10th Cir. 1991)).  Mr. Compton's issue is analogous to a case of juror impartiality.  In a juror impartiality claim, to establish a due process violation, the trial must have resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved "such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas,* 381 U.S. 532, 542 (1965).  I also note that the Ninth Circuit Court of Appeals has found that a sleeping juror does not constitute juror misconduct. *Morris v. Ylst,* 52 F.3d 334, (table, text in Westlaw) 1995 WL 234352 (9th Cir.), *cert. denied,* 116 S. Ct. 109 (1995).

Like other juror-related issues, including the credibility and demeanor-matters of a juror, *see Wainwright v. Witt*, 469 U.S. 412, 424-26 (1985), the trial court is in the best position to assess a juror's misconduct, including sleeping during the presentation of testimony.  Accordingly, I find that the Colorado Court of Appeals' determination that a new trial was not in order, based on the trial court's observations, is not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court.  The sleeping juror claim, therefore, lacks merit.

### 3.  Claim Three/Admission of DNA Test

In the Application, Mr. Compton asserts his due process rights were violated when the trial court judge denied trial counsel's request that the prosecution be required to establish foundation regarding their DNA expert's testimony.  (Application at 10-11.)

Mr. Compton further asserts that the prosecution's expert told the jury that the process he used to determine the DNA profile of blood stains from a jacket, a leather glove, and a rubber glove was an accepted scientific process, but he failed to identify the name of the process. (Application at 11.) Furthermore, Mr. Compton contends that the expert told the jury that the statistical information was from a Federal Bureau of Investigation (FBI) database, but he did not explain how the data presented was calculated. (Application at 11.) Mr. Compton also asserts that he could not afford a DNA expert and that he was denied a request by the trial court for funds to obtain an expert. (Application at 11.) Mr. Compton concludes that the jury was misled by the expert and was not able to evaluate and assign proper weight to the expert's conclusions.

Mr. Compton also asserts that his due process rights were violated when the prosecution's DNA expert told the jury he was "infallible" and misrepresented the meaning of a "match." (Application at 12.) Mr. Compton further asserts that the expert's interpretation of the data was a prejudicial representation of the numbers he presented, and the expert did not tell the jury that the data presented in exhibit # 16 only applied to a full profile match. (Application at 12.) Mr. Compton contends that the expert did not describe the likelihood of a random match with what was a minor component of the "mixed" stain found on the jacket and the leather glove, and the jury used the numbers of a full profile in considering the minor components of the mixed stains. (Application at 12.) Mr. Compton further contends that the expert witness also misled the jury when he testified that in exhibit # 16 a complete DNA profile was present and "every one matched." (Application at 12.) Mr. Compton also contends that the

expert never told the jury how many of the "hereditary trait genes" he determined, and his testimony suggests that all existing hereditary trait genes were determined when only a few "loci",[2] equaling a small percentage, were defined.  (Application at 13.)  Mr. Compton concludes that the expert misled the jury by suggesting that the DNA from the blood stains was identical to Mr. Compton's and to the victim's "complete genetic package."  (Application at 13.)

Mr. Compton further asserts that the prosecution repeatedly mischaracterized the DNA evidence, told the jury that the defense agrees with the DNA evidence, and shifted the burden of proof to Mr. Compton.  (Application at 13.)  Mr. Compton contends that the mischaracterizations are highly prejudicial with respect to the so-called mixed stains on the leather glove and jacket, because the mixed stains were partial profiles and were only consistent with the victim's and Mr. Compton's profiles and were not matches. (Application at 13.)

Respondents argue that there was a proper foundation established by their two DNA expert witnesses and that the testimony was sufficient to enable the jury to understand the test results without being confused or misled.  (Answer at 19.) Respondents further argue that any danger of confusion did not outweigh the significant probative value of the DNA evidence.  (Answer at 19.)  Respondents also argue that (1) the jury properly was advised regarding exhibit 16; (2) exhibit # 16 properly distinguished the difference between a full match and a minor component found in a

---

[2]  Loci are various regions of the DNA that are tested to discover the type of DNA in a sample.

mixture; and (3) the probability statistics identified on exhibit # 16 referred specifically to match profiles.  (Answer at 20.)

Respondents further argue that the Colorado Court of Appeals found that it was reasonable to infer from the DNA evidence presented at trial that blood from both the victim and Mr. Compton were found on the leather glove and that Mr. Compton's blood was found on the rubber glove.  Respondents also contend that the prosecution's statement that the DNA evidence was accepted by the defense did not rise to the level of plain error.  (Answer at 20-21.)

Respondents further assert that the statistics given to the jury were provided in the format suggested by the National Research Council.  (Answer at 21.)  Respondents also contend that a DNA expert testified that the Colorado Bureau of Investigation (CBI) routinely analyzes seven genetic loci along the length of the DNA molecules being reviewed, and a match is defined as having all seven loci exactly the same.  (Answer at 21.)  They further contend that the expert's definitions were sufficient to state to the jury that the DNA tested from each sample was representative of the entire strand of DNA, and the statistical information was in keeping with the definitions.  (Answer at 22.)  As for the leather glove and jacket, Respondents also contend that the expert witnesses testified that when they found only a partial profile match the samples were described as being consistent with Mr. Compton's sample and not as being a match with Mr. Compton's sample.  (Answer at 22.)

Respondents further argue that the Colorado Court of Appeals found that the expert's reference to a "100 percent accuracy" did not mislead the jury or guarantee that

the jury would accept the expert's conclusion on faith.  (Application at 20.)

Respondents further assert that all analysts at the CBI are proficiency tested four times

a year and must "type"[3] more than 100 samples with a partner and match their results

before doing any case work.  (Answer at 22.)  Respondents contend that the

representation by the expert of the test results was not to establish that the CBI DNA

expert was infallible but that he was highly accurate.  (Answer at 22.)

     Respondents conclude the DNA evidence showed that blood on the rubber glove

and the leather glove recovered from the dumpster near Mr. Compton's residence

matched both Mr. Compton's DNA and the victim's DNA, and that the probability of a

random individual having a DNA profile matching Mr. Compton was approximately one

in six million.  (Answer at 23.)  Respondents further conclude that based on this

evidence it was reasonable for the prosecution to infer that it was Mr. Compton's blood

mixed with the victim's and not some other unidentified, random individual and that it

was proper for the prosecution to draw the inference explicitly for the jury during closing

argument that the blood came from Mr. Compton.  (Answer at 23.)  Respondents also

conclude that it was proper for the prosecution to argue that the DNA evidence was

uncontroverted because trial counsel during closing referred to the blood found on the

leather glove as Mr. Compton's blood.  (Answer at 23.)

     Respondents further conclude that Mr. Compton is incorrect in stating that the

burden of proof was improperly shifted to the defense, because the trial court repeatedly

instructed the jury that the prosecution had the burden of proving beyond a reasonable

---

[3] Typing involves testing to determine the DNA profile of a sample.

doubt that Mr. Compton committed the crime as charged. (Answer at 23.)

"As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence . . . ." *Moore v. Marr*, 254 F.3d 1235, 1246 (10th Cir. 2001). Without a showing that the admission of the evidence violated a specific constitutional guarantee, I will not disturb the state court's evidentiary ruling unless it is "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (internal quotation marks and citation omitted).

a. Proper Foundation

With respect to Mr. Compton's proper foundation claim, the Colorado Court of Appeals found as follows:

> Defendant first contends that the trial court erred in allowing the prosecution to introduce evidence of the results of DNA testing without establishing a proper foundation for the evidence. We do not agree.

> The admissibility of DNA Evidence is [sic] Colorado is determined under the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), for admission of novel scientific evidence. Under that standard, both the underlying theory and the techniques used to apply the theory must be generally accepted within the relevant scientific community. *Fishback v. People*, 851 P.2d 884 (Colo. 1993).

> Once it has been established that the underlying theory and the techniques employed are generally accepted, the evidence is admissible. Any challenge with respect to the implementation and execution of the techniques goes to the weight, not the admissibility, of the evidence. *See Fishback v. People, supra*, 851 P.2d at 893 ("concerns that may arise in the implementation of . . . otherwise generally accepted techniques are not relevant factors under a *Frye* analysis"); *Lindsey v. People*, 892 P.2d 281 (Colo. 1995) (DNA

26

statistical frequency analysis was generally accepted and thus admissible; disputes over its reliability went to weight, not admissibility).

Whether the *Frye* standard has been met is a question of law, which we review *de novo*. *Lindsey v. People*, *supra*.

In this case, defendant does not dispute that the theory underlying DNA testing is generally accepted. However, he points out that some types of DNA testing and statistical frequency calculation have not been expressly found acceptable in Colorado cases and have been questioned by some in the scientific community. Thus, he argues, because the prosecution's DNA experts from the Colorado Bureau of Investigation (CBI) did not adequately identify and describe the tests they used, the requirements for admission of the evidence were not met. We are unpersuaded.

We note at the outset that a CBI laboratory report in the record includes specific information about the test results used in this case to develop the DNA profiles. Although, as defendant points out in his written rebuttal submitted to us after oral argument, that report was not referred to at trial and does not identify the test by name, it was admitted at the May 1997 preliminary hearing. Defense counsel indicated at that hearing that he had reviewed the report. During a pretrial motions hearing three months later, defense counsel made reference to CBI hair and fiber tests results, and then stated:

> Essentially, Your Honor, I just want to note for the record that we have not filed a motion on the *Frye* evidence on the those [sic] nor do we intend to.

> Those tests have been in, I've met with CBI, I've also met with our experts. We'll not be pursuing any *Frye* claims.

Based on these statements, the trial court could reasonably have concluded that defendant was not intending to challenge the admissibility, under *Frye*, of any CBI test results to be offered by the prosecution, including the DNA test results.

Further, even assuming defense counsel's statement was not intended to waive the right to challenge the CBI's DNA test results, it is undisputed that defendant did not request a *Frye* hearing on the DNA evidence.  Absent such a request, the trial court was not required to conduct a pretrial *Frye* inquiry into the admissibility of the evidence.  *See People v. Banks*, 804 P.2d 203 (Colo. App. 1990) (if scientific evidence to be offered is of a type that has been admitted in other cases, a pretrial *Frye* inquiry is necessary only if the opposing party makes a timely request for such inquiry, supporting such request by reference to authorities that indicate that there may not be general scientific acceptance of the principle employed).

At trial, after the CBI scientist who had conducted the DNA testing had been accepted without objection as an expert in the area and had explained in fairly general terms what DNA testing is and how it is done at the CBI laboratory, he began explaining the test results shown on a prosecution chart summarizing those results.  Defense counsel objected based on insufficient foundation, arguing that the witness had not gone through what the testing was, what it showed, and how it was determined that there was a "match."  The court allowed the witness to testify, pointing out that defense counsel could cross-examine him about these matters.

Thereafter, the expert testified regarding what he had done to test each of the bloodstains and what the test results showed.  He explained that all of the DNA testing done at the CBI meets the "standards that have been determined by what is called TWIGDAN, which is the working group for DNA analytical methods;" that the CBI laboratory undertakes various types of quality control to ensure accuracy; and that the frequency statistics shown on the prosecution's chart were from the Federal Bureau of Investigation Published Data Base.  That data base, he stated, is a scientifically accepted source for statistical frequency figures, having been published in the scientific journals and reviewed by other scientists in the academic word and the forensic community.  The expert also testified that some of the testing in this case was done in the presence of a defense expert.

A second scientist from the CBI laboratory was qualified as an expert in forensic DNA analysis and testified, without

objection, in further detail regarding the tests that had been run.  For example, she explained to the jury that, to find a "match" in a bloodstain, the CBI routinely analyzes seven different genetic locations or loci along the length of the DNA molecules.  A match means that all seven of the loci are "exactly the same as the individual's that are listed [on the chart] as matching those particular person's."

Following the testimony of these witnesses, the prosecutor resubmitted the chart to which the witnesses had been referring, and the chart was admitted without objection.

We conclude that the trial court's failure to require a more thorough foundation before allowing testimony concerning the DNA test results does not warrant reversal of defendant's conviction.  The expert witnesses did describe the testing techniques used and the source of the frequency statistics, albeit not in great detail.  They testified that the source of the statistics was "scientifically accepted" and that the testing techniques met applicable testing standards.  Although defense counsel had the CBI lab report prior to trial and defendant's expert had been present for at least some of the testing, defendant did not — either before trial or when the prosecution sought to offer the DNA evidence at trial —apprise the trial court of any authority suggesting that there might not be general acceptance in the scientific community of the CBI's testing techniques.  *See People v. Banks*, *supra*.  In these circumstances, the trial court did not err in admitting the DNA evidence and permitting defense counsel to attack the weight of that evidence on cross-examination.

Contrary to defendant's contention, if DNA evidence is properly admitted under *Frye*, the trial court need not undertake a separate analysis of its admissibility under CRE 702 or CRE 901.  *See Fishback v. People*, *supra*.

DNA evidence admissible under *Frye* may still be excluded under CRE 403 if its probative value is substantially outweighed by the danger of unfair prejudice.  *See Lindsey v. People*, *supra*.  Although defendant did not invoke CRE 403 at trial, he argues on appeal that the evidence should have been excluded under that rule because the absence of a proper foundation made the

> testimony confusing and misleading.  We conclude that the
> foundation laid by the experts was sufficient to enable the
> jury to understand the test results without being confused or
> misled, and that, in any event, any danger of confusion did
> not outweigh the significant probative value of the evidence.

*Compton*, No. 98CA0704 at 2-8.

Although the trial court denied trial counsel's objection based on lack of

foundation, during the expert's testimony, I find, like the Colorado Court of Appeals, that

any lack of foundation that may have existed prior to the expert's testimony was

overcome by the information provided by the expert.  The trial court's denial was at best

harmless error.  The expert explained that the FBI Published Database provides the

frequency of DNA types that are found in the United States, including the African-

American population, the Caucasian population, and the Southwestern-Hispanic

population.  Vol. # 8 at 221-23.  The expert confirmed that the database is a

scientifically accepted source, because it has been published in the scientific journals

and has been reviewed by peers, which means that scientists in both the academic

world and the forensic community have reviewed and approved the publication.  Vol. # 8

at 222.

The expert further explained that the FBI database, although not precise,

provides the best estimate of how common a particular DNA profile is in the population

by determining the probability that blood was not deposited by Mr. Compton but was

deposited by someone other than Mr. Compton.  Vol. # 8 at 223.  The prosecution's

expert also confirmed that all testing done at the CBI and the Denver Police Department

Crime Laboratory meets the standards of the Technical Working Group on DNA

Analysis Methods (TWIGDAN), which is the working group for DNA analytical methods. Vol. # 8 at 224.  The expert further testified that all analysts at the CBI laboratory take four proficiency tests per year and type over a 100 samples before doing any case work.  Vol. # 8 at 224.  The expert described two "built-in" controls that are conducted with each sample that is run and asserted that there was no contamination found or inaccuracies found in the testing process for the blood samples run and presented as evidence in this case.  Vol. # 8 at 225.

Although Mr. Compton argues that the state's expert did not name the process he used for the DNA testing or what the testing involved and offered no explanation on how the numbers were calculated that were presented as statistical information provided by the FBI Database, I find that sufficient foundation was laid by the expert to enable the jury to understand the test results.  The expert, as set forth above, stated that all testing done at the CBI laboratory uses the standards of the TWIGDAN.  The expert further described the controls that were used to assure that there were no problems with the sampling.

Furthermore, although Mr. Compton complains that the expert should have explained in more detail how the statistical information established by the FBI database was calculated, he does not challenge the correctness of the statistical information or state how identifying the name of the process that was used by the CBI, or explaining how the statistical information is calculated, would have aided the jurors in their understanding of the test results.  Moreover, as found by the Colorado Court of Appeals, and set forth below, exhibit # 16, itself, informed the jurors that the probability

of selecting an unrelated individual at random from the population having a profile matching the victim is approximately 1 in 11,000 African-Americans, 1 in 3,100,000 Caucasians and 1 in 3,800,000 Southwestern Hispanics, and having a profile matching the defendant is approximately 1 in 6,100,000, African-Americans, 1 in 1,200,000,000 Caucasians, and 1 in 39,000,000 Southwestern Hispanics.  (Application at 15 (ex. # 16).

Mr. Compton, in his Traverse, in support of the lack of foundation claim, asserts that "a cursory comparison of the CBI test results and the authorities shows that the CBI did not perform a Restriction Fragment Length Polymorphism (RFLP) [DNA] test in this case," which he claims is a more exact test than the Polymerase Chain Reaction (PCR) DNA test, based on testimony that was provided by his DNA expert who testified in his Rule 35(c) postconviction motion hearing.  (Traverse at 11-15 and 29-31.)  Mr. Compton also appears to argue that the Colorado Supreme Court's decision in *State of Colo. v. Shreck*, 22 P.3d 68 (Colo. 2001), in which the court found that the PCR analysis is admissible under the Colo. R. Evid. 702, does not apply to his case because he was convicted in 1998.  (Traverse at 3.)

Because *Frye* does not set a specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the test used in Mr. Compton's case rendered the trial fundamentally unfair.  *Wilson v. Sirmons*, 536 F.3d 1064, 1101 (10th Cir. 2008) (citations omitted).  The test used in Mr. Compton's trial was not fundamentally unfair based on the following.

First, *Shreck* involved a 1998 conviction and a reversal on appeal of the trial court's finding that PCR DNA analyzed evidence was inadmissible.  Second, the DNA

expert who testified at Mr. Compton's postconviction hearing indicated that at the time of the trial he was using a PCR-based testing in his own DNA laboratory and contrary to Mr. Compton's suggestion in his Traverse gave no indication that an RFLP test was more exact than a PCR test.  Vol. # 14 at 11.  I find, therefore, that the PCR-based testing in Mr. Compton's case was not so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.

Accordingly, the state court's decision regarding the foundation claim was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Mr. Compton's foundation claim lacks merit.

### b.  Misleading Testimony

Mr. Compton asserts that the prosecution's DNA expert witness told the jury he was infallible and misrepresented the meaning of a "match" and of the statistical frequency numbers.  (Application at 12.)  Mr. Compton contends that the expert was incorrect in telling the jury that there is at best a 1 in 6,100,000 chance (or at worst a 1 in 1,200,000,000 chance) that the blood was not deposited by Mr. Compton.  (Application at 12.)  Mr. Compton, relying on *The Evaluation of Forensic DNA Evidence*, publication, asserts that the numbers more properly reflect the probability that a person randomly selected from the relevant population will have a DNA profile matching the DNA profile developed for Mr. Compton.  He also asserts that the Committee on DNA Forensic Sciences urges the avoidance of the common mischaracterization made by

the expert, because of the potential confusion and prejudice to the defense. (Application at 12.)

Mr. Compton further contends that the expert did not tell the jury that the statistical frequency numbers identified on exhibit # 16 only applied to the full profile match and did not describe the likelihood of a random match with what he called minor components of the mixed blood stain on the jacket and on the leather glove. (Application at 12.)  Mr. Compton also contends that the expert led the jury to believe that all of the hereditary genes were typed-up, when only a few loci were typed resulting in a very small percentage of the hereditary genes being identified in the match. (Application at 12.)

Respondents, also relying on *The Evaluation of Forensic DNA Evidence* publication, argue that the statistics given to the jury were provided in the format suggested by the National Research Council, which is "what is the probability that a person other than the suspect, randomly selected from the population, will have this profile."  (Answer at 21.)  Respondents conclude that the expert's explanation was proper.

Respondents also assert that one of the DNA expert witnesses testified that the CBI routinely analyzes seven genetic locations or loci along the length of the DNA molecules of the sample in question.  (Answer at 21.)  They further assert that the expert defined the match as having all seven loci exactly the same for both samples, including the blood stain sample and Mr. Compton's DNA sample, and that a match meant that the entire DNA profile was present.  (Answer at 21.)  Respondents further

assert that the definitions were sufficient to inform the jury that the DNA tested from each sample was representative of the entire strand of DNA.  (Answer at 22.)

Respondents further contend that the stains found on the jacket, the gloves, and the stairwell contained samples that only partially matched Mr. Compton, and when asked about these items, the expert testified that they only had a partial profile and not a full profile match.  (Answer at 22.)  Respondents also contend that the expert pointed out to the jury that he used the term "consistent" with originating from Mr. Compton when a full profile match was not present.  (Answer at 22.)

As for the infallible claim, Respondents contend that the expert was explaining to the jury that all of the analysts do proficiency testing, that they do four tests a year, and that before they do any analyzation they must type more than 100 samples with a partner and match results, in an attempt to show the jury that the analysts' proficiency tests were highly accurate and not to show that the expert in particular was infallible. (Answer at 22.)

With respect to Mr. Compton's misleading testimony claim, the Colorado Court of Appeals found as follows:

> We also disagree with defendant's contention that the first DNA expert offered misleading testimony regarding the DNA evidence.
>
> Because defendant did not object to the challenged testimony in the trial court, we review his contentions only for plain error.  Plain error has occurred when, after review of the entire record, we can say with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.  *See Bogdanov v. People,*, 941 P.2d 247 (Colo. 1997); *People v. Thompson*, 950 P.2d 608 (Colo.

App. 1997).

First, defendant contends that the DNA expert mischaracterized the significance of the statistical frequency numbers shown on the prosecution's chart by testifying that the numbers represent the "probability that the blood was not deposited by [defendant]," and that the frequencies were calculated to show "the chance that someone other than [defendant and the victim]" deposited the blood.

However, the chart itself informed the jurors that "the probability of selecting an unrelated individual at random from the population having a profile matching [(the victim) is approximately 1 in 11,000 African-Americans . . . ] [(defendant is approximately 1 in 6,100,000 African-Americans . . . ]."  Defendant does not contend that this explanation of the significance of the statistical frequency numbers was incorrect.  Because the jury was properly advised on the chart, we conclude that any oversimplification or mischaracterization in the expert's testimony did not amount to plain error.

Defendant also asserts that the expert did not tell the jury that the statistical frequency numbers applied only to the full profile "matches" shown on the chart.  However, the chart distinguishes "matches" from mixtures that included a minor component "consistent with originating from" defendant's or the victim's blood, and the explanation of the statistical frequency numbers refers specifically to "matching" profiles.

Further, the expert later explained that the term "match" only applied to a full profile, and that when the term was used on the prosecution's chart it meant that "the complete DNA profile was present, and every one matched."  He distinguished situations in which there was not a complete match.  As noted above, the second prosecution expert also explained the meaning of the term match as used on the chart.  In light of this testimony, we cannot conclude that the jury failed to understand that the statistical frequency numbers applied only to the full profile matches shown on the chart.

Nor do we agree that the expert's reference to "100 percent accuracy" misled the jury or guaranteed that it would

> accept his conclusions on faith, as defendant contends.  The
> statement appears to refer, not to the overall accuracy of the
> CBI laboratory's DNA analyses, but to specific proficiency
> tests taken by this expert and another CBI analyst before
> they started doing DNA analysis in any cases.  Further, the
> jury was instructed, both at the time of the expert's testimony
> and again at the conclusion of the trial, that it was to be the
> judge of the credibility of the witnesses and to decide what
> testimony, if any, to believe.  We decline to conclude that
> the jury disregarded that instruction based on the witness's
> reference to "100 percent accuracy."

*Compton*, No. 98CA0704 at 8-10.

I have reviewed the transcript of the testimonies provided by both of the prosecution's DNA expert witnesses and find as follows.  Mr. Davelis, explained with sufficient detail the difference between a match that contains a full DNA profile and a minor component that has only a partial DNA profile and shows a consistency with a sample.  Vol. # 8 at 220-21.  He also explains with sufficient detail whether a match or a consistent partial profile was found on each of the items containing a blood stain.  *See* Vol. # 8 at 220- 221.  Furthermore, exhibit # 16 sets forth the significance of the statistical frequencies by stating that the numbers represent the probability of selecting an unrelated individual at random from the population matching Mr. Compton, which is the explanation that Mr. Compton argues should be used.

The explanation of the statistical frequencies on exhibit # 16 refers only to matches and does not address consistent findings.  There is no indication that the jury would have misconstrued that the statistical frequencies applied to both consistent findings and matches.  Nonetheless, even though Mr. Compton argues that the expert's explanation was confusing and prejudicial to the defense, he does not set forth how the

explanation was so different from the information provided in exhibit # 16 that the jury would not have been able to determine the credibility of the evidence.

Mr. Davelis further, in response to the prosecution's question regarding the quality controls used at the CBI, stated that all analysts take five proficiency tests, in which they type at least 100 samples with another analyst and are required to be 100 percent accurate, before being able to do any case work, and subsequently four proficiency tests each year. *See* Vol. # 8 at 224. Nothing in the response Mr. Davelis provided addresses his infallibility in Mr. Compton's case. The purpose of the response was to establish quality control practices at the CBI.

Finally, with respect to Mr. Compton's argument that the experts misled the jury by stating that a complete DNA profile was present and that every one matched, I find that the second expert, Ms. Brown-Dressel, explained to the jury exactly what is included in a match. *See* Vol. # 8 at 242. Ms. Brown-Dressel stated that routinely at the CBI seven different genetic locations or loci along the length of the DNA molecules are analyzed, and a match means that all seven of the loci analyzed were exactly the same. *Id.*

Based on the above determinations, I find that Mr. Compton's misleading testimony claim lacks merit. The state court's decision regarding the misleading testimony claim was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

c.  Prosecution's Statements

In the Application, Mr. Compton asserts that the prosecution repeatedly mischaracterized the DNA evidence, told the jury that the defense agreed with the DNA evidence, and in so doing, shifted the burden of proof to the defense.  (Application at 13.)  Mr. Compton contends that the mischaracterizations were highly prejudicial with respect to the mixed stains on the leather glove and the jacket, because the expert did not state that the minor component in the mixed stain matched either the victim or Mr. Compton but only that the minor component was consistent with either the victim or with Mr. Compton.  (Application at 13.)  Mr. Compton asserts that the prosecution referred to the stains as either the victim's blood or Mr. Compton's blood misstating the DNA results as conclusively establishing the source of the DNA.  (Application at 13.)

Respondents argue that the DNA evidence showed that the blood found on the rubber glove and on the leather glove recovered from a dumpster near Mr. Compton's residence matched both Mr. Compton and the victim.  (Answer at 23.)  Respondents further argue that the probability of a random individual having a DNA profile match to Mr. Compton was approximately one in six million.  (Answer at 23.)  Respondents conclude that it is a reasonable inference from this evidence that it was Mr. Compton's blood that was mixed in with the victim's and not some other unidentified, random individual, and, therefore, proper for the prosecution to draw the inference explicitly for the jury during the closing argument that the blood came from Mr. Compton.  (Answer at 23.)

Respondents further conclude that it was proper for the prosecution to argue that

the DNA evidence was uncontroverted, because not only did the evidence go unchallenged, but trial counsel referred during his closing argument to the blood found on the leather glove as Mr. Compton's blood.  (Answer at 23.)  Respondents also argue that the burden of proof was not shifted to the defense, because the court repeatedly instructed the jury that the prosecution had the burden of proving beyond a reasonable doubt that Mr. Compton committed the crime and that the defense does not have the burden of calling witnesses or producing any evidence.  (Answer at 23.)

With respect to the prosecution's statements during closing, the Colorado Court of Appeals found as follows:

> We likewise conclude that statements made by the prosecutor during closing argument regarding the DNA evidence did not amount to misconduct requiring reversal.
>
> Defendant did not object to the remarks at trial.  Thus, our review is again limited to determining whether plain error occurred.  *See* Crim. P. 52(b); *Wilson v. People*, 743 P.2d 415 (Colo. 1987).
>
> A prosecutor is entitled to argue the facts in evidence and reasonable inferences from those facts.  *People v. Holloway*, 973 P.2d 721 (Colo. App. 1998).
>
> During closing argument, the prosecutor stated that defendant's blood and the victim's blood were found "mixed" on the leather glove and the jacket, that the victim's blood was on the glove, and that defendant's blood was on the rubber glove.  Defendant contends that these comments improperly asserted that the source of the blood stains was conclusively established.
>
> It was a reasonable inference from the DNA evidence that both the victim's blood and defendant's blood were found on the leather glove and that defendant's blood was found on the rubber glove.  Although the prosecutor's reference to the "mixed" stains arguably went beyond what

> could reasonably be inferred from the DNA profile, we conclude that they did not cast such doubt on the reliability of the conviction as to amount to plain error.
>
> Defendant also argues that, by stating in rebuttal argument that the DNA evidence was "uncontroverted" and "unrebutted," the prosecutor improperly shifted the burden of proof.
>
> We do not perceive these comments as shifting the burden of proof.  However, to the extent they could be so understood, we conclude that the jurors were not misled on this issue but, instead, followed the court's instructions that defendant was presumed innocent, that the burden of proof as to all elements of the charged offense was on the prosecution, and that they could not infer anything from defendant's silence or from the number of witnesses appearing for or against a proposition.  *See People v. Gillis*, 883 P.2d 554 (Colo. App. 1994).
>
> Finally, defendant argues that, by stating that the DNA evidence was "accepted . . . by both sides in this case," the prosecutor improperly asserted that the defense agreed with that evidence.  In light of the fact that this was only a single, brief comment and that defense counsel had previously challenged the prosecution's bloodstain evidence in his closing argument, we do not view the comment as rising to the level of plain error.

*Compton*, No. 98CA0704 at 10-12.

The prosecution "possesses reasonable latitude in drawing inferences from the record." *Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002) (citing *Duvall v. Reynolds*, 138 F.3d 768, 795 (10th Cir. 1998); *Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999)).  Prosecutorial misconduct does not warrant federal habeas relief unless the conduct complained of "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974); *see also Mahorney v. Wallman,* 917 F.2d 469, 472 (10th Cir. 1990).  In

evaluating whether improper prosecutorial comments render a trial fundamentally unfair, I should view the comments within the context of the trial as a whole. *United States v. Young,* 470 U.S. 1, 11-12 (1985). "[N]ot every trial error or infirmity . . . constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.' " *Donnelly,* 416 U.S. at 642 (quoting *Lisenba v. State of California,* 314 U.S. 219 (1941)).

I have reviewed the transcript of the prosecution's closing argument and have determined the following. The prosecution's remarks during closing argument did not render the trial fundamentally unfair. Mr. Compton's leather glove contained a mixed stain that contained blood, DNA that matched Mr. Compton's DNA, and DNA that was consistent with a partial DNA profile of the victim. (Application at 15 (ex. # 16).) The leather glove also contained a separate blood stain that matched the victim. (Application at 15 (ex. # 16).) In light of (1) the match to the victim of the separate bloodstain found on the leather glove, along with the finding of a bloodstain that included a partial DNA profile of the victim and a match with Mr. Compton's DNA profile near the cut in the leather glove; and (2) a finding of a bloodstain that included a partial DNA profile of Mr. Compton and a match with the victim's DNA profile on the leather jacket, it is fair for the prosecution to infer that there was a mix of Mr. Compton's blood and the victim's blood on the leather glove and on the jacket. (Application at 15 (ex. # 16).) Prosecution's statement that the victim's blood and Mr. Compton's blood were found mixed on the leather glove, therefore, does not render the trial fundamentally unfair.

Furthermore, nothing in the prosecution's statements shifted the burden of proof

to the defense.  The jury was properly instructed on the prosecution's responsibility to prove beyond a responsible doubt that Mr. Compton committed the offense with which he was charged.  The state court's decision regarding the prosecution misconduct claim, therefore, was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

### 4. Claim Four/ Ineffective Assistance of Counsel

It was clearly established when Mr. Compton was convicted that a defendant has a right to effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  To establish that counsel was ineffective, Mr. Compton must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense.  *See id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  There is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance."  *Id.*  It is Mr. Compton's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances.  *See id.*  Under the prejudice prong, Mr. Compton must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  If Mr. Compton fails to satisfy either prong of the two-part *Strickland* test, the ineffective assistance of counsel claim must be dismissed.  *See id.* at 697.  Finally, ineffective assistance of counsel claims are mixed

questions of law and fact.  *See id.* at 698.

Mr. Compton asserts that trial counsel was ineffective for failing to challenge the admissibility of the DNA evidence.  (Application at 16.)  In support of this claim, Mr. Compton asserts that his postconviction DNA expert testified that the DNA on the leather glove may not have come from blood but from other body fluids, including saliva from an individual placing the leather glove in his mouth, which is not uncommon for someone to do.  (Application at 16.)  Mr. Compton also asserts that his postconviction expert found the same flaw with trial testimony regarding the jacket and provided testimony that would have supported an alternate suspect.  (Application at 16.)  Mr. Compton contends that the postconviction expert attorney provided evidence that (1) trial counsel should not have referred to the DNA as a bloodstain; (2) trial counsel did not understand basic DNA concepts and should have hired a DNA expert; and (3) trial counsel erred in not filing a motion to exclude the testimony regarding the population frequency statistics or the DNA in any way.  (Application at 16-17.)

Mr. Compton further asserts that his postconviction DNA expert provided testimony regarding the mix of blood on the leather glove and that the minor component of the mixture being only a partial DNA profile had a random match probability of only one in ten or one in eight.  (Application at 17.)  Mr. Compton contends that trial counsel was ineffective in not objecting to the prosecution's incorrect reference to the mix of Mr. Compton's blood and the victim's blood on the leather glove and for failing to raise a cross-contamination claim, because Mr. Compton and the victim were close friends and wore each others' clothing.  (Application at 17.)

44

Respondents argue that the DNA postconviction expert testified at the Colo. R. Crim. P. 35(c) hearing that he ran the same DNA tests against the same evidence tested by the CBI and his results were the same, that his testing essentially corroborated the CBI's testing, and that the statistical frequencies regarding the probability of a random match were equivalent. (Answer at 25.) Respondents do concede that the expert quarreled with the language of the CBI report because of the possibility of contamination with the mixture of Mr. Compton's DNA and the victim's DNA. (Answer at 25.)

Respondents further argue that trial counsel also testified at the postconviction hearing that he consulted with a DNA expert and read numerous books and articles to become educated on DNA evidence. (Answer at 26.) Respondents also argue that trial counsel stated at the hearing that he had nothing to work with, given his expert's evaluation of the evidence. (Answer at 26.) Respondents further state that trial counsel testified that he came to the conclusion that it was a futile strategy to launch a challenge to the DNA and to try and convince the jury that the DNA did not belong either to Mr. Compton or to the victim, because the jury ultimately would believe that the DNA came from Mr. Compton and the victim. (Answer at 26.)

Respondents contend that, in light of Mr. Compton's own postconviction DNA expert corroborating the results of the CBI's testing, it is impossible to find that he was prejudiced by trial counsel's alleged failure to attack the DNA evidence. (Answer at 27.) Furthermore, Respondents contend that the PCR type DNA testing used in this case has been determined reliable by the Colorado Supreme Court in *People v. Shreck*, 22

45

P.3d 68 (Colo. 2001).  (Answer at 27-28.)  Respondents also contend that, in light of the

postconviction expert's corroborated results of the CBI's testing, it was reasonable for

trial counsel to conclude that the jury was ultimately going to believe the sources of the

DNA were Mr. Compton and the victim.  (Answer at 28.)

Respondents further argue that pursuant to *Strickland* Mr. Compton must

overcome the presumption that, "under the circumstances, the challenged action might

be considered sound trial strategy," because "choices made after thorough investigation

of the law and facts relevant to plausible options are virtually unchallengeable."

(Answer at 28.)  Respondents conclude that even if I were to find that trial counsel's

representation fell below the requisite standard, Mr. Compton still was not prejudiced

based on the postconviction expert's inability to find fault with the results of the CBI's

DNA testing.  (Answer at 29.)

With respect to Mr. Compton's ineffective assistance of counsel claims, the

Colorado Court of Appeals found as follows:

> Defendant argues that the trial court erred by finding that
> he had failed to carry his burden of showing a reasonable
> probability that, but for the alleged shortcomings of counsel
> with respect to the DNA evidence, the outcome at trial would
> have been different.  We disagree.
>
> Because defendant's retesting of the DNA evidence
> corroborated the CBI's results , he is "not challenging the
> accuracy of the DNA" testing conducted by the CBI.  Instead,
> defendant faults counsel for:  (1) not challenging the
> testimony of the prosecution's DNA expert indicating that the
> statistical frequency numbers shown on the prosecution's
> chart represented the "probability that the blood was not
> deposited by [defendant]," and that the frequencies were
> calculated to show "the chance that someone other than
> [defendant and the victim]" deposited the blood; (2) not

establishing that the probabilities applicable to the matches of full-profile samples of DNA did not also pertain to the comparisons where one of the DNA samples was incomplete (and not challenging the prosecution's DNA expert when he testified that his laboratory had achieved "100 percent accuracy," a statement which the division in *People v. Compton*, *supra*, concluded was a reference to the results of a proficiency test, and not to the DNA testing in this case); (3) not establishing, either through cross-examination of the prosecution's expert witness or by the introduction or evidence, that some of the DNA retrieved from the leather glove might have come from an unseen source other than blood, such as saliva which could have been deposited on the gloves due to the fact that defendant and the victim were close friends who frequently shared items of clothing; and (4) not introducing evidence indicating that police officers could have transferred DNA material from one item to another while gathering evidence.

With respect to defendant's first two allegations, we conclude, for the reasons set forth in *People v. Compton*, *supra*, that the clarifying statements printed on the prosecution's chart of statistics, in conjunction with the testimony of the prosecutions's DNA experts, ameliorated any possible prejudice to defendant resulting from trial counsel's failure to challenged the prosecution's presentation of the statistical evidence relating to DNA matching.

Defendant's next claim — that he was prejudiced by trial counsel's failure to demonstrate that some of the DNA samples could have come from unseen sources other than the tested bloodstains — is highly speculative. Without accompanying evidence affirmatively establishing how and when such non-blood DNA-bearing material could have been deposited, reasonable jurors informed of this hypothesis would most likely have concluded that the DNA was retrieved from the tested blood samples. Indeed, as trial counsel admitted in his closing argument, there was no evidence indicating that the victim had ever worn the leather glove. Moreover, defendant did not present any evidence at the postconviction proceeding suggesting that the victim had ever worn the leather glove or leather jacket, and defendant's DNA expert admitted that "when you take a look at a bloodstain and find human DNA in it, the most likely

47

thing that you are going to end up with is that you have got DNA from the bloodstain that you are detecting."

Finally, defendant does not specify what evidence in the record supports his assertion that "there was evidence that the police handled the jacket and then handled the gloves using the same gloves, and thus there was the distinct possibility of cross-contamination." *See People v. Graybeal*, _ _ P.3d __ (Colo. App. No. 05CA0089, Jan. 25, 2007) (an appellate court will not search through the record for evidence to support a party's claim). Although, at the postconviction hearing, defendant did ask his expert witness about the possibility of such cross-contamination, defendant stated he was basing this examination on a "hypothetical[ ]" scenario. Furthermore, the trial record showed that the leather jacket and the gloves were recovered from separate dumpsters by different officers.

In summary, we are not persuaded that the strength of the DNA evidence would have been meaningfully diminished if trial counsel had attacked it on the foregoing grounds now identified by defendant. Moreover, the other evidence of defendant's guilt was compelling. Accordingly, we uphold the trial court's determination that defendant did not carry his burden of showing a reasonable probability that, but for the alleged deficiencies of trial counsel, the outcome would have been different. Thus, we need not address the trial court's finding that trial counsel's performance was professionally reasonable. *See People v. Fulton*, *supra*.

*State of Colo. v. Compton*, No. 05CA1442, 8-11 (Apr. 19, 2007).

a.  Admissibility of DNA Evidence

Based on the above findings, under Section "3. Claim Three/Admission of DNA Test," I find that trial counsel was not ineffective in failing to challenge the admissibility of the DNA evidence. Also, at the hearing in Mr. Compton's Rule 35(c) postconviction motion, Mr. Compton's expert in forensic DNA testing conceded that the testing he performed corroborated the results of CBI's testing. Vol. # 14 at 48. Furthermore,

postconviction counsel for Mr. Compton stated that the results of the accuracy of the DNA results were not being challenged.  Vol. # 14 at 3.

### b.  Hiring DNA Expert

With respect to the expert hiring claim, Mr. Compton fails to set forth any allegations in the Application in support of this claim.  I find, however, that in the Rule 35(c) postconviction motion brief Mr. Compton has attached to his Traverse he asserts that trial counsel was ineffective in not having an expert as an advisor during trial and in not having an expert to explain and challenge the DNA evidence presented by the prosecution and to inform the jury of the inaccuracy of the evidence.  (Traverse at 49.)

Trial counsel testified at the Rule 35(c) postconviction hearing that he did hire a DNA expert that was well-known in Colorado by other criminal defense attorneys.  Vol. # 16 at 11.  He further asserts that (1) the expert provided him with reading materials to familiarize him with DNA issues; (2) the expert was available for consultation throughout the entire trial; and (3) the expert reviewed all of the results of the prosecution's experts, reviewed all the testings and procedures of the CBI, and was present during some of the testing.  Vol. # 16 at 6-7 and 25.  Trial counsel further asserts that the DNA expert was not called as a witness, because the defense strategy did not involve challenging the accuracy of the DNA determinations.  Vol. # 16 at 26.  Moreover, trial counsel states that had the DNA expert testified he would have had to agree with the prosecution's expert testimony in a cross-examination by the prosecution.  Vol. # 16 at 26.

Based on the findings below, Mr. Compton fails to assert how not having the DNA expert available as an advisor at the trial fell below an objective standard of

reasonableness and counsel's deficient performance resulted in prejudice to his

defense.

### c.  Objections to DNA Testimony

Upon review of Mr. Compton's Application and Reply, including the attached

copies of the briefs he filed in his Rule 35(c) postconviction motion, I find that Mr.

Compton claims trial counsel was ineffective in:

> (1)  Failing to challenge the DNA in any way;

> (2)  Incorrectly referring to the DNA as a bloodstain;

> (3)  Failing to object to the population frequency statistics on exhibit # 16; and

> (4)  Failing to argue that the problem with cross-contamination is that the particles are so small they are invisible and it is impossible to know if cross-contamination occurred.

I have reviewed with great scrutiny the transcripts for the postconviction hearing

during which Mr. Compton had both a DNA expert and a criminal-defense-attorney

expert testify in support of his ineffective assistance of counsel claim.  Vols. # 14 and

# 15.  I also reviewed the postconviction hearing testimony by Mr. Geller who was trial

counsel for Mr. Compton.  Vol. # 16.

With respect to the above-noted areas in which trial counsel failed either to object

or to discredit the prosecution's DNA evidence, I find the following.  First, Mr. Compton's

claim that trial counsel failed to challenge the DNA in anyway is vague and conclusory

and is without merit.  Second, Mr. Compton's claim that trial counsel was ineffective in

referring to DNA as a blood stain, without more, lacks merit.  Mr. Compton, in his

Traverse, has attached an unwieldy number of pages that appear to be copies of the briefs he filed in state court.  To the extent in these attached pages Mr. Compton raises any new issues regarding the reference to a blood stain by trial counsel, a court usually does not address issues raised for the first time in a reply brief.  *Boones v. Carlsbad Bancorporation*, 972 F.2d 1545, 1554 n. 6 (10th Cir. 1992).

In his Traverse, Mr. Compton refers to Volume # 15 at 22-25 for support of his claim that trial counsel was wrong to refer to the DNA as a bloodstain.  (Traverse at 32.)  The exact quote of trial counsel, referred to by postconviction counsel at the postconviction hearing reads as follows:  "There was one blood stain of Peter Compton on that jacket.  Nobody can tell us how old that stain is.  There were several bloodstains of Richard Redwine on that jacket and then there was another stain, a bloodstain from a third party, not Richard Redwine's and not Peter Compton's."  Vol. # 15 at 22.  Mr. Compton's postconviction criminal defense expert found this statement to be a fallacy not because the statement was inaccurate but because trial counsel jumped to an unnecessary conclusion.  Vol. # 15 at 22.  The criminal defense expert concluded that he would not have conceded that the blood belonged to any of the parties.  Vol. # 15 at 23.

Nonetheless, under cross-examination the criminal defense expert agreed that there was blood and at least some of the DNA came from blood, on the jacket and the leather glove, but argued it was error to not challenge the source of the DNA.  Vol. # 15 at 55.  Furthermore, under cross-examination, the criminal defense expert also agreed that there were some places where it was very clear that there was human blood.  Vol.

# 15 at 64.

Mr. Geller, trial counsel for Mr. Compton, testified at the postconviction hearing that the defense strategy was not to discredit the DNA findings but to explain how the DNA from Mr. Compton and the victim were on the jacket and the leather glove.  (Vol. # 16 at 10.)  Mr. Geller, upon consulting with the expert he had hired, determined that he would not be successful in attacking the integrity of the CBI findings and convincing a jury that the DNA found on the leather glove and the jacket was not either Mr. Compton's DNA or the victim's DNA.  Vol. # 16 at 9.  In keeping with Mr. Geller's strategy, his referring to a bloodstain was not unreasonable and was not prejudicial to Mr. Compton.

Nothing in the criminal defense expert's testimony raises a concern that Mr. Geller was ineffective in referring to the DNA evidence findings as bloodstains.  Vol. # 15.  Accordingly, I find that trial counsel's referral to the bloodstains of Mr. Compton, the victim, and an unknown person did not demonstrate that counsel's performance fell below an objective standard of reasonableness or that counsel's deficient performance resulted in prejudice to Mr. Compton's defense.  The bloodstain claim, therefore, lacks merit.

Third, as for Mr. Geller's failure to object to the population frequency statistics on exhibit # 16, I found above that the exhibit was properly admitted and the explanation of the statistical frequencies on the exhibit refers only to matches and does not address consistent findings.  I concluded that there is no indication that the jury would have misconstrued that the statistical frequencies applied to both consistent findings and to

matches.  In that there is no indication that the jury would have misconstrued the information provided on exhibit # 16 and that the information was incorrect, I find no reason that trial counsel was ineffective in not objecting to the exhibit.

Mr. Compton, therefore, fails to assert how not challenging the population frequency statistics fell below an objective standard of reasonableness and counsel's deficient performance resulted in prejudice to his defense.  I also note that trial counsel did question the basis for exhibit # 16 during trial.  Vol. # 8 at 218-19.  The trial court responded to trial counsel's inquiry by allowing the exhibit subject to cross-examination. Vol. # 8 at 219.  Trial counsel also motioned to strike the testimony provided by one of the prosecution's DNA experts with respect to exhibit 16, which was granted by the trial court.  Vol. # 8 at 235.  The statistical frequencies claim lacks merit.

Finally, with respect to Mr. Compton's cross-contamination claim, Mr. Compton's DNA evidence expert testified at the postconviction hearing that there is no indication that the CBI mishandled any of the samples used in DNA testing in this case.  Vol. # 14 at 63-64.  Furthermore, Mr. Compton fails to assert that the leather jacket or the leather glove were items of clothing he and the victim both wore and, therefore, would be subject to cross-contamination.  Accordingly, Mr. Compton fails to assert how not raising a cross-contamination claim fell below an objective standard of reasonableness and counsel's deficient performance resulted in prejudice to his defense. The cross-contamination claim, therefore, lacks merit.

### d.  Prosecution's Closing Arguments

Even if trial counsel's performance fell below an objective standard of

53

reasonableness in failing to challenge the prosecution's assertion that Mr. Compton's blood and the victim's blood were mixed and found near the cut in the leather glove and also were mixed and found on the leather jacket, counsel's deficient performance did not result in a prejudice to his defense.  The criminal defense expert for Mr. Compton at the postconviction hearing conceded that even without testimony about the mixture of blood and the partial profile statistics there still would have been testimony to the jury that the possibility of randomly pulling someone out of the population that had the same DNA profile as that found on the leather glove and the jacket was one in over six million, which the jury would have heard even with the best cross-examination by trial counsel. Vol # 15 at 67.

Furthermore, the criminal defense expert also conceded at the postconviction hearing that there was other evidence that trial counsel could not have kept away from the jury including (1) Mr. Compton's incise injury to his hand that was likened to a slippage injury from a single-edged knife, which was the type of knife used to stab the victim; (2) an ID witness seeing Mr. Compton leave the scene at about the time of the murder; and (3) the matching of Mr. Compton's DNA or finding of a consistent profile of Mr. Compton's DNA and the finding of a consistent profile of the victim's DNA on items found in a dumpster near where Mr. Compton lived.  Vol. # 15 at 67.  Therefore, the prosecution closing argument claim lacks merit.

### e.  Conclusion

I find that the state court's decision regarding ineffective assistance of counsel was not contrary to or an unreasonable application of any clearly established rule of

federal law as determined by the U.S. Supreme Court.

III.  CONCLUSION

Accordingly, it is

ORDERED that the Application is **DENIED** and the action is **DISMISSED WITH PREJUDICE** either on the merits or as procedurally barred.  It is

FURTHER ORDERED that each party shall bear his own costs and attorney's fees.  It is

FURTHER ORDERED that the Clerk of the Court is directed to return to the Adams County District Court the state court records, including a black bound Volume I and a CD Rom marked Volumes 2-16.

Dated:  September 22, 2009

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge